## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMF TRUST VENTURES LLC and SUNSCAPE FAMILY LIMITED PARTNERSHIP, | |
| Plaintiffs, | |
| v. | C.A. No. _____ |
| i80 GROUP LLC, i80 GROUP SPECIALTY FINANCE 2019 GP LLC, i80 GROUP SPECIALTY FINANCE 2021 GP LLC, i80 GROUP SPECIALTY FINANCE 2022 GP LLC, i80 GROUP VINTAGE GP LLC, AND MARC HELWANI, | |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiffs AMF Trust Ventures LLC ("<u>AMF</u>") and Sunscape Family Limited Partnership ("<u>Sunscape</u>"), by and through their undersigned counsel, file this Complaint against i80 Group LLC (the "<u>i80 Investment Manager</u>"); i80 Group Specialty Finance 2019 GP LLC (the "<u>i80 General Partner</u>," and together with i80 Investment Manager, the "<u>Management Entities</u>"); i80 Group Specialty Finance 2021 GP LLC, i80 Group Specialty Finance 2022 GP LLC, i80 Group Vintage GP LLC (collectively the "<u>i80 Iconiq Defendants</u>"); and Marc Helwani, ("<u>Helwani</u>") and allege as follows.

1.      This case is about an entrepreneur, Marc Helwani, who sought seed money for his investment fund and business, and promised long-term, high returns for those who remained patiently with the business as it grew over time.  Helwani urged investors to invest – and then re-invest – with repeated representations and assurances that, as the business expanded and attracted new capital and opportunities, they would realize the benefit.  Helwani consistently presented

projections with returns going out for 10 years, and promised investors returns on a growing capital base. Helwani further induced investment by preparing and distributing financial models showing the same long-term horizon, which reflected limited upside in the first years of the investment, and substantial returns based only after projected expansion and growing scale over years.

2.      On information and belief, Helwani's inducements and agreements were a ruse. Helwani drafted corporate documents and agreements reflecting the fund structure to draw investors in, and entered into separate agreements confirming investors' rights going into the future as the business expanded. Yet, despite his consistent promises and commitments to Plaintiffs, Helwani was simply using these investors to build the business, attract more capital, and generate outsized returns for himself in the future, rather than sharing them on the promised terms. In short, Helwani's scheme was to use Plaintiffs' capital to build the business and to attract bigger investors with larger investments down the road, but once he had those new investors on board, to take the spoils for himself. And when Helwani found his golden goose, he promptly reneged on his agreements as planned, and violated his duties to ensure a bigger slice of the pie for himself.

3.      Helwani tried to cover up his deception behind a shell-game of misleading representations designed to convince his investors to accede and help facilitate his scheme, and complicated restructurings of the business designed to deprive his initial investors of the very returns he promised in return for their support. Helwani knew the deal he had made with his investors, and that he would have to change the terms to keep them from sharing in the fruits of the business on the terms he had offered. He knew – and admitted – that he "**had to** restructure all of [the] legal entities" to achieve his goals, but offered false comfort by saying that the

2

changes would simply "help us better manage our accounting of your interests going forward."[1] Helwani even tried to coerce Plaintiffs to accede to his revised terms by withholding annual distributions unless they signed away existing rights and interests.  It was only as Helwani used these pressure tactics to get Plaintiffs to give away their rights that the truth about his scheme began to be revealed.

4.      In truth, Helwani was acting opposite to the "interests" of the investors.  From the outset, Helwani needed the investors' money to build up the business, but he wanted the long-run fruits of the business for himself.  And so, despite the promises and agreements he made in soliciting repeated investments, his duties to the business and the investors, and his obligations under the federal securities laws, Helwani and his entities pressed forward in violation of the law.  To this day, Helwani has continued to try to justify his actions by telling investors he could have cut them out anyway, and by characterizing a promised proposal of a supposed reinvestment in "new" opportunities on a greatly diluted basis as a generous favor.  Indeed, when Plaintiffs resisted Helwani's efforts, he did just that, announcing their forced withdrawal from the business to try to elude any further interference with his scheme.  But the law is clear, and Helwani cannot talk his way out of the consequences of his actions.

5.      Although Helwani tried to make things complicated to obscure his intentions, the facts of this case are straightforward.  In the simplest terms, Helwani reached out to prospective investors (like Plaintiffs) in 2017 to invest in his investment firm and to purchase a "revenue share" in the returns and fees generated by the business.  Thus, Helwani described the offering as "credit-like downside protection with venture-like upside returns," which he called "unlimited

---

[1] Emphases in quotes herein are added.

upside optionality." That upside was from the profits from a "revenue share" in the incentive fee generated by the fund's performance.

6.     Because the success of the business was dependent on future returns and assets, the value proposition lay in the long-term development and expansion of the business over time. Indeed, this was the crux of Helwani's 2017 pitch: he promised Plaintiffs that the entities in which they would become members would manage a growing fund which would continue to seek new partners and capital going out into the future. Helwani knew the investment made no sense as a short-term proposition, given its nascent stage and risk of failure. He left no doubt that he was offering an opportunity to share in the fund's upside. Plaintiffs agreed to invest based on Helwani's assurances and separate agreement that the business would manage and receive profits from all assets under management.

7.     The business plan Helwani pitched contemplated one investment fund that would attract new capital and grow, and thus increase returns to Helwani and the other owners of the "revenue share." This unitary fund structure resulted in the formation of three entities: a limited partnership that was the investment fund; an LLC that was the management company to oversee operations and invest the LP's assets; and a General Partner of the LP (actually, an LLC that would serve as the LP's general partner) to receive the incentive fees due to the fund managers and to be distributed to the members of that LLC. Thus, at first, there were only corporate entities and documents for those three entities related to the single fund.

8.     Helwani then doubled-down on his scheme in 2019, when he sought additional investment by Plaintiffs as part of a "restructuring" of the business from an "open-ended" to "close-ended" structure, and documented that change with revised corporate documents. In 2019, to ensure Helwani was not changing the deal, Plaintiffs sought promises that the deal had

not changed, and Helwani reconfirmed the parties' agreement as to the long-term and expanding nature of the investment. Consistent with his prior assurances and the parties' clear understanding, Helwani solicited additional investments by Plaintiffs expressly premised on the management of current *and* future capital, including through new fund vehicles not yet added to the business. Helwani reflected this commitment in financial models and detailed projections of revenue, profit, and return he provided Plaintiffs to solicit their further investment, all premised on the long-term growth of the business, and he recognized and discussed with Plaintiffs that the investment made no sense otherwise. As a further inducement, Helwani offered an increased revenue share in exchange for staying in the business for the long term, such as the waiver of certain redemption rights.

9.     As Helwani made these changes, which he falsely downplayed as insignificant, Plaintiffs continued to seek assurances the parties' bargain remained the same. They specifically sought confirmation from Helwani that nothing had changed from the parties' agreement as to the nature of the investments and the revenues in which they would share – *i.e.*, from all assets under management. Thus, as Helwani modified the corporate structure to further implement the parties' 2017 agreement, he "confirmed" the earlier agreements and that the businesses in which Plaintiffs were investing would share in all profits "**forever more.**"

10.     As Helwani sent new documents for Plaintiffs to sign for the restructured fund, Plaintiffs needed to be sure the parties' agreement remained intact despite any structural changes. So they asked Helwani directly about future capital raises – an integral component of the parties' agreement from the outset – to ensure their participation on the same terms and at the same levels, including in any new funds. If and when new funds were added, agreements including Plaintiffs' same revenue share would have to be drafted for those new entities. But those new

5

funds did not yet exist, and so Helwani provided the assurances, and Plaintiffs relied on them. Helwani left no doubt.  He wrote to "confirm" that "**as a General Partner, you participate in all funds we launch, in-dependent of any names.**"

11.     Helwani knew Plaintiffs understood the parties' agreement and his assurances to preclude him from entering into separate partnerships, creating separate funds under different management, or siphoning off business opportunities, in which Plaintiffs would not participate on the same terms.  Plaintiffs' principal wrote:

> Thanks.  To clarify number one, **I am relying on our conversation that you confirmed that you will not create a separate fund in the future in a related business area that will be part of a separate entity that I am not a GP of**.  Regardless of you saying the aforementioned will never happen and my reliance on your statement, in any unexpected situation where it does, I expect to be offered the opportunity to come in under the same ownership of the current entity I am a GP for.

12.     Helwani again left no doubt.  Copying his counsel, he agreed: "**Confirmed**. Thank you for clarifying that."  That same day, Plaintiffs invested another $2.6 million in the business on the basis of Helwani's agreement and assurances.

13.     Still, Helwani was not done.  In 2020, he *tripled* down, soliciting yet more money from Plaintiffs to invest in the business as he was nearing a deal to secure the type of capital and returns he had been promising Plaintiffs all along.  Helwani sent the same financial model, showing the same long-term returns, and as he was requesting Plaintiffs to sign new documents, confirmed their percentage interest.  But in what?  Helwani had just informed all General Partners that he was raising a "first" nine-figure fund and spoke explicitly about that "set[ting] the foundation" for additional funds with a "significantly larger" investor base, and then confirmed Plaintiffs' percentage interest in the business.  Obviously, this was only a reason for Plaintiffs to invest if they would participate in profits and fees generated from those additional

funds.  There was no doubt as to the parties' agreement and Helwani's commitment.  All totaled, Plaintiffs AMF and Sunscape have invested $3.1 million for Class B Interests that represent a 7% ownership stake in the business.  But Helwani lied to his "partners" and breached their agreements.  After repeated statements and confirmations – to induce Plaintiffs' original investment and agreement, and later to induce additional multimillion dollar investments – about the "scale" and long-term growth of the business, and Plaintiffs' entitlement to participate in all related funds, Helwani's scheme was finally revealed.  Helwani landed his "significantly larger" investor – Iconiq Capital, a prominent investment fund with over $83 billion in assets under management – with exponentially higher management fees and profits in line with the financial models he sent Plaintiffs, and proceeded to do exactly what he had promised not to do: he diverted the "related business area" opportunity to a separate fund structure he created for his own benefit, with no participation by Plaintiffs at all unless they exchanged their interests in the business for new interests on a severely diluted basis.  This was precisely the sort of opportunity Helwani had promised Plaintiffs when soliciting their initial and recurring investments.  But just a few short years into the investment, and after prying even more capital infusion from Plaintiffs with confirmation and assurances of their long-standing agreement, Helwani acted to take the lion's share of the opportunity for himself.

14.     Helwani knew he (individually and on behalf of the Management Entities) was acting directly in contravention of the parties' agreements, his course of conduct, his words, and his fiduciary duties.  So, he and his employees tried to cover up his actions through obfuscation.  With no explanation, and even false and misleading assurances that it would be a "better" deal for Plaintiffs, Helwani and the Management Entities tried to induce Plaintiffs to agree to change their deal to protect themselves from the terms they had negotiated and to which Plaintiffs were

entitled.  Helwani falsely downplayed the significance of his machinations, asserting that he was only requesting minimal changes to their agreements.  And he even imposed improper coercion by withholding mandatory distributions to force Plaintiffs to agree.  In truth, the changes Helwani sought were huge – and were designed to divest and dilute Plaintiffs' interest in the business.  Plaintiffs refused to agree to Helwani's expropriation of their interests, and so Helwani, on May 24, announced that he and the Management Entities were forcing Plaintiffs' withdrawal from the business, in clear violation of the parties' agreements.  Plaintiffs bring this suit to remedy these wrongs and enforce their bargain.

## PARTIES AND RELEVANT NON-PARTIES

15.     Plaintiff AMF Trust Ventures LLC ("AMF") is a Delaware Limited Liability Company with its principal place of business in Florida.  AMF is an accredited investor as defined by Rule 501 of Regulation D.  Ariel Friedler directly or indirectly manages AMF.

      a.   On or about June 23, 2017, AMF purchased 1% of the Class B Member interests in i80 Investment Manager and i80 General Partner, for $500,000.

      b.   On or about June 28, 2019, AMF purchased an additional 3.825% of the Class B Member interests in i80 Investment Manager and i80 General Partner, for $1,700,000.

16.     Plaintiff Sunscape Family Limited Partnership ("Sunscape") is a Delaware Limited Partnership with its principal place of business in Delaware.  Sunscape is an Accredited Investor as defined by Rule 501 of Regulation D.  Ariel Friedler directly or indirectly manages Sunscape.

      a.   On or about June 22, 2020, Sunscape purchased 2.025% of the Class B Member interests in i80 Investment Manager and i80 General Partner, for $900,000.

17.     Plaintiffs' investments in the Class B Member interests in the Management Entities are the "Class B Member Interests."  Holders of the Class B Member Interests are the "Class B Members" or sometimes referred to by the parties as "General Partners."

18.     Defendant n/k/a "i80 Group Specialty Finance 2019 GP LLC" (the i80 General Partner) is a Delaware Limited Liability Corporation and maintains a principal place of business at 900 Third Avenue, Suite 1403, New York, New York 10022.  i80 General Partner has two classes of interests, Class A interests and Class B interests.  i80 General Partner is the general partner of and, among other things, manages, nonparty i80 Group Specialty Finance 2019 LP (the "i80 Limited Partnership") – a private investment fund.  The i80 Limited Partnership's investment objective was to generate returns and income by partnering with non-bank lenders to originate loans or make investments in other credit related assets.

      a.  i80 General Partner is controlled by Defendant Helwani.  Defendant Helwani (or entities he controls) is a Class A Member and "Manager" of i80 General Partner.

      b.  i80 General Partner has changed names several times.  In 2017, it was originally founded as "i80 Group Lending Opportunities GP LLC."  In 2019, the name was changed to "i80 Group Specialty Finance GP LLC."  In 2021 or 2022, the entity's name apparently changed again to its current iteration, "i80 Group Specialty Finance 2019 GP LLC."

19.     Defendant i80 Group LLC (the i80 Investment Manager) is a Delaware Limited Liability Corporation and maintains a principal place of business at 900 Third Avenue, Suite 1403, New York, New York 10022.  Defendant i80 Investment Manager is an affiliate of i80 General Partner and serves as investment manager to the i80 Limited Partnership.  i80 Investment Manager has two classes of interests, Class A interests and Class B interests.

a.  i80 Investment Manager is controlled by Defendant Helwani.  Defendant Helwani
(or entities he controls) is a Class A Member and "Manager" of i80 Investment
Manager.  i80 Investment Manager is responsible for evaluating and monitoring
the investments of, and providing day to day managerial and administrative
services to, i80 Limited Partnership.  i80 Investment Manager makes all
investment decisions for the i80 Limited Partnership.

20.   Nonparty i80 Group AB LLC is a Delaware Limited Liability Corporation formed
by Helwani in 2021 to replace Defendant i80 Group LLC.  Nonparty i80 Group Specialty
Finance GP AB LLC is a Delaware Limited Liability Corporation formed by Helwani in 2021 to
replace Defendant i80 Group Specialty Finance GP LLC (these two "AB" entities are
collectively the "i80 AB Entities").  As described herein, in 2021 and 2022, Defendant Helwani
sought to induce Plaintiffs to exchange their interests in the Management Entities for interests in
the i80 AB Entities.  But, as noted below, the i80 AB Entities had materially different LLC
agreements, rights and potential economic benefits to the Class B members.

21.   On information and belief, defendant Marc Helwani is a resident of the State of
New York, and maintains a principal place of business in New York, New York.  Mr. Helwani
founded the i80 Group business and is the principal of i80 Investment Manager.  Helwani is a
Class A Member in both i80 General Partner and i80 Investment Manager.  Helwani also serves
as the "Manager" of i80 General Partner and i80 Investment Manager.  On information and
belief, Helwani (or entities he controls) owns Class A Interests in the i80 AB Entities.  On
information and belief, Helwani also has controlling interests in the investment manager and
general partner entities in the "i80 Iconiq Fund Group" discussed *infra*.

10

22.     On information and belief, Defendant i80 Group Vintage GP LLC is a Delaware Limited Liability Corporation and maintains a principal place of business in New York, New York.

23.     On information and belief, Defendant i80 Group Specialty Finance 2021 GP LLC is a Delaware Limited Liability Corporation and maintains a principal place of business in New York, New York.

24.     On information and belief, Defendant i80 Group Specialty Finance 2022 GP LLC is a Delaware Limited Liability Corporation and maintains a principal place of business in New York, New York.

25.     Defendants i80 Group Vintage GP LLC, i80 Group Specialty Finance 2021 GP LLC, and i80 Group Specialty Finance 2022 GP LLC are collectively referred to herein as the "i80 Iconiq Defendants."

26.     The i80 Iconiq Defendants were set up, at least in part, to manage and profit from additional investment funds in the same business as the original i80 Limited Partnership, and from which Helwani is seeking to eliminate or vastly reduce Plaintiffs' participation, contrary to the parties' agreements.  Those additional investment funds include an investment fund set up in connection with a significant investment made by Iconiq Capital ("Iconiq").  The limited partnership investment fund associated with the Iconiq investment and the i80 Group is i80 Group Specialty Finance 2022 LP (the "i80 Iconiq Fund").  For simplicity, the group of upstream management entities (including the i80 Iconiq Defendants) set up to manage and receive fee income from i80 Iconiq Fund and other i80 Group funds from which Helwani is seeking to eliminate or reduce Plaintiffs' participation is referred to herein as the "i80 Iconiq Fund Group." The business opportunity presented by the Iconiq Fund and Iconiq Fund Group is the "Iconiq

Opportunity."  On information and belief, Helwani holds significant ownership stakes in the companies that comprise the i80 Iconiq Fund Group.

## JURISDICTION AND VENUE

27.     This court has jurisdiction over the parties hereto because, as asserted herein, the securities claims asserted herein arise under and pursuant to Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and the rules and regulations promulgated thereunder by the Securities Exchange Commission, including Rule 10b-5, 17 C.F.R. § 240.10b-5.  This Court has pendent jurisdiction over all other related claims.

28.     Venue is proper in this Judicial District pursuant to Section 27 of the Securities Exchange Act of 1934 and 28 U.S.C. § 1391(b) because all Plaintiffs and all of the entity Defendants are Delaware entities; acts and transactions that constitute violations alleged herein occurred in Delaware; Defendants are found in, inhabit, and/or transact business in Delaware; a substantial part of the events or omissions giving rise to this action occurred in Delaware; and a substantial part of the property that is the subject of this action is located in Delaware.

## FACTS

29.     In 2017, Defendant Helwani started an investment firm with a strategy of creating a single fund, and raising and managing capital to generate returns and income by partnering with non-bank lenders to originate loans or make investments in other credit-related assets.  The proposed structure was straightforward:  Upper tier entities would manage the fund through a limited partnership, a management company (an LLC entity) would make the investment decisions, and a general partner (another LLC entity) would receive a portion of the return generated.  The limited partnership would be managed by the investment manager company and pay a management fee – here, 1% of assets under management ("AUM").  The general partner of

the limited partnership would receive performance and incentive fee distributions from the business.  In a typical hedge fund structure, the performance fee is 20% of the fund's profit; in this case, the performance fee ranged from 10% to 15%. The general partner's profit participation, therefore, is significant and very valuable.

30.     Helwani formed the i80 Limited Partnership on or about May 30, 2017, with the name "i80 Group Lending Opportunities Fund LP."  Defendant i80 General Partner serves as the i80 Limited Partnership's general partner, and is contractually entitled to receive the incentive fee.  Defendant i80 Investment Manager serves as the i80 Limited Partnership's Investment Manager, and receives 1% of AUM as a management fee.

31.     To induce investors to provide capital to the limited partnership to get the business off the ground and entice future (and larger) investments, Helwani also offered a revenue share in the Management Entities: i80 Investment Manager and i80 General Partner. Specifically, Helwani offered investors to purchase Class B Interests in both entities at a price of $500,000 for a 1% interest in each.  Limited partners who also purchased Class B Interests received discounted management fees on their investment, which provided further inducement to purchase the Class B Interests.  Helwani and his partners owned Class A Interests in the Management Entities.  In essence, Helwani offered investors a piece of his hedge fund management business if they provided seed capital for the business.  As he described it, investors were "investing in an operating business" and "owning a piece of [Helwani's] firm (a private-equity investment)."

32.     Indeed, Helwani told investors the investment was even "better" than just owning a piece of his firm, because it was a "revenue share" (sharing the revenue and profit generated by

the investments), with a perpetual existence, with long term growth and value.  Stated otherwise, Helwani, through i80 Group marketing materials, characterized the investment as a "royalty":

> A revenue share is a royalty.  It's a claim on revenue as opposed to a claim on profit, which occurs after all expenses are paid.  It is significantly more valuable to own a claim on revenue, which all of you, as investors have.

33.     Helwani knew that the Class B Interests in the Management Entities would only generate meaningful returns on the $500,000 investment if distributions made to the GP as a return on capital were both significant and made over many years.  Thus, the value of the Class B Interests depended on three things Helwani touted: (i) the increasing scale of the business (as reflected by the growing amount of AUM); (ii) the long-term, multi-year nature of the distributions; and (iii) the underlying investment performance.

34.     From the outset, the i80 business constituted a single, open-ended fund structure (and limited partnership structure) that would continually raise capital, build AUM, and grow the underlying capital base through investment and performance.  Indeed, that is exactly the pitch Helwani used to induce Plaintiffs and others to put their money into the venture.  So, to encourage investment, Helwani marketed the underlying Class B Interests as a "revenue share" of the distributions to be made from all assets managed by Helwani and the i80 entities.  And Helwani highlighted the long-term, multi-year nature of the investment.  Marketing materials from early 2017 stated:

> · Management company is raising up to $10mm (GP capital) **for up to 20% revenue share of all fees**
> ***
> · 20%+ **7-year IRR** and 2.5x+ ROI
> · 30%+ **10-year IRR** and 6x+ ROI

Through this structure, the Class B investors would, as Helwani assured, be "owning a piece of our firm," through their "invest[ment] in an operating business."

35.     Helwani documented this structure through LLC Agreements for both i80 Investment Manager and i80 General Partner, which reflected the single open-ended fund through which all capital would be raised and managed as part of the business.

36.     As discussed more fully below, the LLC Agreement for i80 Investment Manager demonstrated the open-ended agreement that Class B Members would receive revenue share from all assets to be managed by the business.  Section 6.2 of that agreement expressly contemplated allocation of all "Management Fees" received by the LLC to the Members. Management Fees were not limited to any particular investment fund because the parties contemplated that the entity would manages all assets managed, and there was only one fund at that time.  (Notably, in 2021, Helwani tried to get Plaintiffs to agree to change these terms by limiting these "Management Fees" to only the original, first fund, thus expressly carving out the Iconiq Funds.)

37.     To protect against the dilution of value of the Class B Member interests in the business by the addition of future investors, Plaintiffs demanded, and Helwani agreed to include, an antidilution clause in the LLC Agreements.  This was important because it protected Plaintiffs from Helwani unilaterally reducing their revenue share in the business – *i.e.*, effectively what Helwani is seeking to do now.  Thus, the Class A Members (including Helwani) agreed that no Member's interest "may be reduced" without the prior written consent of the Member.  But, on information and belief, but unbeknownst to Plaintiffs, Helwani's plan, in the event of profitable opportunities for himself in the future, was to try to make an end-run around the parties' agreement by creating a different bucket for the same business that was part of the same "firm" and "operating business" into which he induced Plaintiffs to invest, but in which Plaintiffs would have no right to participate.

38.     To protect Class B Members from being stranded in an inactive shell if the Class A Members (such as Helwani) transferred their interests, Class B Members also were accorded "Tag Along Rights."  Tag Along Rights guaranteed that in such a transfer scenario, the Class B Members could elect a transfer on similar terms.  In fact, interests sold via the Tag Along Rights would receive a twelve percent (12%) preferred return.  As discussed below, Helwani later eliminated these Tag Along Rights in the 2021 reorganization of the i80 entities, despite telling Plaintiffs that there were no material changes to the parties' agreements.

39.     Helwani marketed and sold his experience, network, and expertise.  Helwani specifically promoted his business contacts (including "VC Relationships" and "Institutional Relationships"), proprietary models, marketing expertise and financial skills, all of which would yield future investment opportunities in which investors would participate and from which they would benefit.

40.     Helwani specifically touted the firms' confidential technology and distribution platforms that would further help the firms "distribute our product" and "onboard our investors." Indeed, in any business seeking to generate above market returns, the technology, analysis, business methods, strategy, and risk hedging are fundamental to the business and proprietary.  To protect this confidential information and intellectual property, the LLC agreements for both i80 Investment Manager and i80 General Partner restricted and prohibited Members (including Helwani) from disclosing "any information with respect to the Company, the [i80 Limited Partnership], the Managers, or any of their Affiliates" without prior written consent.  This is significant in this case because, on information and belief, Helwani has disclosed and is, along with the i80 Iconiq Defendants, using the very same intellectual property with his "new" investment fund from which he is seeking to exclude Plaintiffs, and without obtaining the

required consent from Plaintiffs.  On information and belief Helwani also used and diverted resources from the Management Entities for the benefit of the i80 Iconiq Defendants.

41.     While the ability to purchase Class B Interests was a material part of the overall investment bargain and an important inducement to investors, the revenue share decreased the income that Helwani would receive from the i80 Limited Partnership's success.  Helwani had effectively sold a portion of his upside to induce investors to invest, which forever decreased the return Helwani could realize from assets under management.  On information and belief, this was part and parcel of Helwani's motive to ultimately divert Plaintiffs' interests to himself when a new substantial investor came along.

42.     On or about June 23, 2017, and based on Helwani's and the i80 entities' representations, agreements, and commitments, Plaintiff AMF contributed $500,000 in capital and received 1% of the Class B Interests.

**The 2019 Confirmation and Restructuring**

43.     In early 2019, Helwani and the Management Entities sought to raise additional capital and announced that they would be restructuring the business and Management Entities. (the "2019 Restructuring").  An i80 Group letter explained the proposed "upcoming changes" to the "fund structure."  First, the letter announced that the i80 Limited Partnership would switch from an "open-ended" evergreen structure to a dedicated specific, "closed-end," fund structure, more closely akin to a private equity type structure.  This had the effect of changing the i80 Limited Partnership's expected life cycle, from open-ended to approximately 5-6 years.  Given that the i80 Limited Partnership was already 2 years old at the time of the proposed restructuring, i80 Limited Partnership's new remaining duration was three to four years from the date of the 2019 Restructuring.  Other proposed changes included a change from discretionary to

"mandatory" quarterly distributions, and a modified Key Man provision as a result of the transition, after an internal dispute, of Christopher Aristides – Helwani's co-founder of the firm – from "Principal" to "employee," thereby leaving Helwani alone as the "sole Principal" and reflecting the "increasing significance" of his personal role.

44. Defendants described and marketed the proposed changes to the underlying investment fund as changes from a "prior fund" to a "new fund," and offered investors the opportunity to redeem their capital, maintain their investment, or add capital "to the new fund." New corporate documents also were drafted to reflect these structural changes to the original open-ended fund.  Again, because only one fund was in existence at that time, the new documents only mentioned the "new fund."  However, as discussed more fully below, Helwani promised, and agreed explicitly, that Plaintiffs would participate on the same terms in any new funds he created as part of the business, which might require new documents based on the deal.

45. As part of the proposed restructuring, Helwani and the Management Entities sent a letter requesting the Class B Members' consent to the changes (the "2019 Class B Consent Letter").  In this letter dated June 13, 2019, Defendant i80 Investment Manager stated that the purpose of the restructuring was to "update the terms of the Fund to correspond with prevailing industry practice and to make certain other modifications that are meant to more closely align the terms of the Fund to the strategy, and, therefore attract additional capital."  The Investment Manager also explained the addition of a Key Person Event provision relating solely to Helwani due to the "increased significance" of his role as the "sole Principal."  The Investment Manager "urge[d]" investors to "vote to 'Approve' the Restructuring."  Existing Class B Members (including, at that time, Plaintiff AMF) were offered an increase in their percentage interest if they approved the requested changes.

46.     Importantly, the 2019 Class B Consent Letter and communications surrounding the proposed restructuring reconfirmed the bargain the parties had made in 2017.  This was the first time Helwani or the Management Entities ever discussed having multiple limited partnerships as part of the business.  In making this change, Helwani consistently made clear that Plaintiffs would continue to benefit from any additional capital raised in connection with the business, no matter the structure.  In other words, the Management Entities and the Class B Members owned a stake in the firm and all funds that would be managed as part of the business. Indeed, if Helwani already had the right to form new management companies to manage "new funds," there was no need or reason for Helwani to obtain Plaintiffs' consent before forming the new business.  Helwani could have simply formed a new management business to manage new capital and let the legacy Management Entities lapse.  But Helwani knew that he could not do this, consistent with his agreements and commitments to Plaintiffs.  That Helwani proposed, requested consent for, and then created a new, shorter-term vehicle in which the Management Entities would manage "new funds" as the next phase of the ongoing business, further evidences Helwani's understanding of the contract previously made.

47.     The announcement that the current fund – the i80 Limited Partnership – would cease to exist just 3-4 years into the future confirmed what the parties had agreed, understood, and bargained for all along.  The proposed new investment was in the "firm" – not just for a business that managed the first single, short-term fund – and contemplated the investors' interests carrying forward into new and additional funds as the business developed and grew.

48.     Again, Helwani and the Management Entities made this clear in multiple ways. In addition to requesting Plaintiffs to agree to the restructuring by approving the 2019 Class B Consent Letter, Helwani and the Management Entities also solicited additional capital from

Plaintiffs (the "2019 Solicitation").  In the course of the 2019 Solicitation, Helwani repeatedly

confirmed the agreement that the Class B Members would receive a revenue share from both

current and future funds that would be managed as part of the management business that

received the revenue share.  Indeed, that was the fundamental consideration for the initial and

each subsequent requested investment.

49.     For example, looking back on the 2019 restructuring in a May 2020 letter to his

"General Partners," Helwani spoke of the 2019 "new fund" as targeting roughly $100 million in

AUM – far less than the projected total amount for the business that he had marketed to investors

from the outset.  He also spoke explicitly about the consistent strategy of including future funds

in the business in which investors like Plaintiffs would participate.  As Helwani wrote:

> We are confident that we will be able to raise over $100 million for
> this fund which would be considered a success and there are several
> outcomes where we could raise substantially more.  **The goal is to
> have a *first* fund that is at least nine-figures which sets the
> foundation for the *second* fund where the addressable investor
> base is significantly larger than the base that invests in a first
> fund.**

Thus, as Helwani confirmed explicitly, unequivocally, and repeatedly (to solicit further

investment), the business plan and consideration for Plaintiffs' agreement to invest, was for the

"General Partners" – the Class B Members – to receive distributions at their participation levels

not only from the now short-term current fund, but from future funds and asset raises as well.

50.     Helwani confirmed the same in an email to one Class B Member on June 24,

2019, during the middle of the 2019 Restructuring and as part of the 2019 Solicitation, in which

he further reiterated the agreement that the Class B Members would earn returns through

launches of multiple investment fund entities and future asset fundraising.  After repeating his

consistent message about GP investments being "analogous to owning a piece of our firm" and

structured to "have no (to very little) downside with unlimited upside optionality," Helwani

assured that "[a]fter two years, that is still the case." He then added:

> We did not burn any of the GP capital even though we could have
> burnt 10% and **we are about to earn mgmt. and carry fees with
> the launch of our 2nd fund. The way one earns return is by the
> firm raising assets.**

51.     Helwani's clear intent – and knowledge of Plaintiffs' understanding – is further

evidenced by more recent actions. When, as described more fully below, Helwani tried to

execute his fraudulent scheme to direct revenue owed to Plaintiffs to himself, he added language

in proposed new corporate agreements that specifically limited Plaintiffs' allocations and

distributions to those arising from the initial fund thus excluding revenues from new funds.

Helwani knew that the language of the documents, and his clear separate agreements with

Plaintiffs, entitled Plaintiffs to distributions from new funds as well. Otherwise, there was no

reason for this language.

52.     Helwani reconfirmed the parties' agreement that Class B Members were entitled

to receive a revenue share from all current and future assets under management in more granular

and detailed ways as well, again specifically seeking to convince Plaintiffs to invest even more

dollars in the "firm." Thus, in March 2019, prior to the closing of the 2019 Restructuring,

Helwani forwarded an Excel spreadsheet to Mr. Friedler, the manager of both Plaintiffs, entitled

"i80 Group - Operating Capital Model" (the "Financial Model"). Helwani sent this model

specifically to demonstrate to Plaintiffs the nature and value of their investment and the parties'

agreements and understanding, and to encourage yet further investment in the business. The

Financial Model showed "Incentive Fee," expected returns and "Investors' profit" based on

assumed AUM, with increasing AUM for a 10-year period, and a "probable case" of $1.75

billion AUM by 2028 – exponentially more than the $100M expected AUM for the current fund,

and years beyond when Helwani and the Management Entities were proposing that "first fund" would expire.  The Financial Model used that same time span – ten years – to reflect "Incentive Fees" paid, "Investors' profit" and "ROI".  According to the Financial Model, the vast majority of Incentive Fee, profit and return occurred **only after three years had lapsed**.  Helwani specifically emphasized this point – bolding, and placing a box around – "Investors' Ownership Yield" and "Cumulative ROI" from 2023-2028.

53.     As the Financial Model makes clear, Class B Members would receive essentially no profit or return in the first three years, and no reasonable investor would have invested in Helwani's firm and business if participation was limited to the first, now closed-ended Fund, much less such a short-term horizon.  It would make no economic sense.  Specifically, under "profit," the Financial Model estimated "Investors Ownership $ per year" totaling $200,000 for the initial four-year period (2019-2022).  On a potential $3.1 million investment, this four-year return was poor and uneconomic.  A potential investor could have made a higher return over that period by investing in risk free government securities rather than Helwani's venture.  Helwani and the Management Entities knew this.  That is why the entire business model and strategy, Helwani's consistent and ongoing pitch, and the parties' agreements, were based on **long-term** returns from future investments and future assets under management, no matter what vehicle held or managed them.  And so, Helwani sought to allay investors' concerns by continuing to mislead them into believing the deal was as Helwani always promised, *i.e.*, that investors would have a revenue share in the *business*, including the growing total of assets under management into the future.

54.     Indeed, Helwani discussed this with Plaintiffs explicitly.  Helwani told Plaintiffs of his ambition to "grow the business" to at least $1.5 billion AUM, and even in emailing the

Financial Model itself, he called the model "conservative" and asserted that "we know we will do better than the 'probable' [projections] just because of the commitments to date." This spreadsheet, the model itself, and everything about it corroborated the agreement that the Class B Members were owners of a business that would now, after the restructuring, manage multiple funds over multiple years. If, as Helwani now asserts, Class B Members' interests and distributions were limited to the first, now closed-ended fund alone (which Helwani said anticipated only around $100M in AUM), Helwani's statements and the Financial Model he provided were indisputably false and misleading. At that AUM, any investment in Class B Interests was nonsensical, and no rational investor would make such an investment, as Helwani's own Financial Model itself demonstrated.

55.    Helwani's assurances and confirmations continued as Helwani pressured Plaintiffs to consent to the restructuring and invest an additional $1.7 million in the firm. On June 20, 2019, Mr. Friedler asked Helwani directly: "Is there anything preventing you from just creating a new entity and using that for future funds"?  Helwani assured Friedler the parties' agreement did not allow for that result:

> **The management company is always the same** and we did a change of the GP entity and renamed it in this doc. So **forever more whatever GP entity we create you have a revenue share**.

56.    Helwani's statements thus confirmed that there would be other "GP entit[ies]" in which Plaintiffs would have a revenue share. That is exactly what the parties bargained for and understood in connection with the "restructuring," but it is the opposite of what Helwani is saying and doing today.

57.    Just minutes after his unequivocal email, Helwani spoke further with Mr. Friedler to address any concerns of Plaintiffs. Helwani and Friedler continued to discuss the issue and the fact that the Class B Interests would manage future funds as well as the current fund.

Helwani specifically discussed the long-term nature of the business, and the fact that by having multiple funds, the returns to Class B Investors grew exponentially.  Those statements, as well, were false and misleading.

58.     Following the call, and anxious to secure a potential $1.7 million additional investment by Plaintiff AMF, Helwani again made sure that Mr. Friedler understood the parties' agreement and his promise.  Helwani sent an email to Friedler that confirmed "**as a General Partner, you participate in all funds we launch, independent of any names.**"  As Helwani has made clear, those statements, as well, were false and misleading.

59.     Perhaps presciently, Friedler wanted to make sure there was no doubt as to what Helwani was confirming.  Adding Defendants' counsel to the email string, Friedler wrote:

> Thanks.  To clarify number one, **I am relying on our conversation that you confirmed that you will not create a separate fund in the future in a related business area that will be part of a separate entity that I am not a GP of**.  Regardless of you saying the aforementioned will never happen and my reliance on your statement, in any unexpected situation where it does, I expect to be offered the opportunity to come in under the same ownership of the current entity I am a GP for.

60.     Ninety seconds later, Helwani replied to put any concerns to rest.  With his counsel still on the email, Helwani wrote: "**Confirmed**.  Thank you for clarifying that."  Those statements, as well, were false and misleading.

61.     The written correspondence to the Class B Members regarding the proposed amendments to the governing LLC Agreement – and relating specifically to the waiver of an otherwise available redemption right caused by the departure of Helwani's business partner – explained the long-term nature of the choice:

> APPROVE: if you have communicated your choice that you would like to **partner with us for the long-term**, we will be increasing your GP revenue share by 12.5% from 2%/$mm to 2.25%/$mm as

of July 1, 2019.   In return you will be waiving next year's
redemption right.

62.     On or around June 28, 2019, and in reliance on Helwani's statements and

assurances, Plaintiff AMF purchased 3.825% of the Class B Interests in i80 General Partner and

i80 Investment Manager for $1,700,000.  But for Helwani's statements and assurances, Plaintiff

AMF would not have made that June 2019 investment.  For all the reasons noted, it would not

have made any economic sense.

**Helwani Confirms and Renews the Agreements Again in 2020**

63.     In May 2020, the Management Entities released their annual investor letter, under

Helwani's authorship, sent to the "General Partners" (the Class B Members).  The May 2020

Letter made the same commitment of capital raising, opportunities, and the pursuit of

"substantially" larger future funds in which Plaintiffs would participate.  Consistent with all prior

communications – and the agreements reached with Plaintiffs – Helwani spoke clearly and

specifically about the "first fund" already completed, which "sets the foundation for the second

fund" with a "significantly larger" investor base.  The existence of a "first fund" and a "second

fund" is consistent with the parties' agreement all along, that Class B Members would profit and

share in revenue generated from all assets raised and under management of the business.

Helwani now suggests the investment was limited to participation in the "first fund" alone,

which would expire before it became profitable, even though he openly spoke of Plaintiffs'

benefiting from a "first" and "second" fund with huge projected returns, along with his

"conviction that we are going to build a lasting business" and the purpose of "building as large of

a business as we can in the future."  But Helwani knew the deal all along, and he made that clear

in every writing.  Otherwise, any "second fund" would actually compete for opportunities with

the first fund and divert management resources away from the business in which Helwani had induced Plaintiffs to invest.  Plaintiffs never would have agreed to that and never did.

64.     During 2020, Helwani continued to report to Plaintiffs on the benefits of "scale" and the value of the "long term, sustainable nature" of the Class B Interests.  In May 2020, Mr. Friedler continued to ask questions on Plaintiffs' behalf about the returns on the investment of the Class B Interests after the 2019 Restructuring.  Helwani's assurances continued:

> unlike a hedge fund, what we are building takes time to **scale**, but **once it does, its very sustainable**.

65.     In a separate communication, Helwani reiterated separately that, unlike other ventures in which an investor puts in capital and hopes for an exit, Plaintiff AMF had "made a few percentage (sic) while waiting for a potentially significant outcome that we **scale** and make money consistently **for years to come**."

66.     Of course, there was no "scale" for the Class B Members if the Class B Interests were limited in duration and tied exclusively to the fees generated by the "first fund."  Nor was the business "sustainable" for the Class B Members if Helwani secretly intended to build new opportunities on their unsuspecting backs, and then take those opportunities for himself by claiming their interests did not include these "second" or "third" funds and beyond, as he had promised.

67.     In June 2020, Helwani followed up these latest communications about the benefits of "scale" and "long term sustainability" with yet another push for Plaintiffs to invest in additional Class B Interests.  Helwani's affirmance of the parties' agreement this time was so consistent that he didn't even bother to work up a new Financial Model – he simply re-forwarded the same email he had sent Mr. Friedler in 2019 with the same spreadsheet titled "i80 Group Operating Capital Model."  And so, once again, Helwani induced further investment with

confirmation of the investment time horizon of ten years, with the most significant returns and profits years in the future, long after the now closed-ended i80 Limited Partnership would have wound down and closed up shop.  And, just as in 2019, if the return on the Class B Interests were limited to the fees generated only by the i80 Limited Partnership, the investment made no economic sense.  As before, if Helwani believed the investment to be limited to the Fund he restructured to be "closed-ended" and short-term, his communications and the financial model he provided were false and misleading

68.     Mr. Friedler again sought further confirmations from Helwani.  When Helwani sent the documents for Plaintiffs to execute, Friedler asked pointedly for confirmation that the increased investment would result in a 7% ownership stake in the business.  Helwani immediately confirmed this to be accurate.  What Helwani did not say was that this 7% interest did not include any participation in the "second" or future funds – and the growing assets under management – he had discussed and that were foundational parts of the parties' agreement. Helwani knew that if he said that, it would disclose his breach, and Plaintiffs would never invest further.  Why would Plaintiffs invest additional dollars in a business set to expire before Helwani's own Financial Model showed the profits would come?  They wouldn't.  And that was never what was agreed.

69.     On or around June 22, 2020, and again in complete reliance on Helwani's reconfirmations and assurances, Plaintiff Sunscape purchased 2.025% of Class B Interests in i80 General Partner and i80 Investment Manager for $900,000.

**Helwani's "Forever" Doesn't Last Long**

70.     On March 25, 2021, less than a year after inducing Plaintiffs' most recent investment with renewed assurances of new funds and long-term returns, Defendants circulated

27

an email to investors that after a nine-month courtship and negotiation "we closed our deal with Iconiq" and that he "couldn't be more excited about **the next phase of the firm**" (the "Iconiq Opportunity").  Iconiq Capital is a large, prominent investment fund with over $83 billion in AUM that provides wealth management services to high net worth clients such as Mark Zuckerberg, Sheryl Sandberg, Jack Dorsey, and Jeff Weiner.

71.     Ultimately, Iconiq invested approximately $450 million in Helwani's firm, through a new i80 investment fund: the "i80 Iconiq Fund," which is in turn managed by the Iconiq Defendants.  The i80 Iconiq Fund is targeting to raise a total of $600 million in AUM, consistent with the AUM and returns Helwani had included in his Financial Model and assurances to Plaintiffs in connection with the parties' agreements and Plaintiffs' investments. Helwani and the Management Entities have described the Iconiq deal as "transformational," and one that will have a dramatic effect on the scale and scope of i80 Group's business, and the potential to generate hundreds of millions in management fees and profit distributions.

72.     Helwani knew that the Iconiq Opportunity fell squarely within the business in which he had induced Plaintiffs to invest.  It was precisely the "next phase" opportunity he had promised he was pursuing – the "second fund" with the "significantly larger" investor base – and that Helwani and the Management Entities used to induce, and formed the basis of, Plaintiffs' investments and re-investments in the "firm."  It was also just the type of fund in which he had promised Plaintiffs would participate in "forever more."  However, with huge returns looming, he wanted those multi-million dollar management fees and profit distributions for himself, and so he did exactly what he had assured Plaintiffs he would not do – he took the position that this new capital raise, in the same "business area," and part of the same business model, was somehow outside the scope of the "firm" business for which he had taken the Class B Members' money.

73.     Helwani knew the Class B Members were entitled to participate in the Iconiq
Funds and Iconiq Opportunity under their existing agreements.  So Helwani had to find a way
around those agreements.  He tried to do this by establishing new entities to function as the
general partner and investment manager for the Iconiq deal and receive the management fee and
profit distributions (the i80 Iconiq Defendants).  If Plaintiffs wished to exercise their rights to
benefit at all from Helwani's second fund, Helwani was intent on forcing them to do so by
exchanging their interests for new ones (the "i80 AB Class B Interests") on far less favorable
terms than the parties had agreed.

74.     This reality of the diversion of the Iconiq Opportunity trickled out as the
opportunity went from press release to closing.  In April 2021, Defendants circulated a revised
economic model to the Class B Members that contained an entirely new, complex corporate
structure showing terms such "Class B Old" revenue share and "Class B Vintage" revenue.
"Class B Old" revenue and return sputtered out in three years, whereas Class B Vintage reaped
large returns in the future.  Helwani carefully managed the messaging around the Iconiq
Opportunity to conceal his underlying scheme and avoid scrutiny.

75.     Ultimately, on November 15, 2021, Helwani sent a letter addressed to his
"Partners" on "i80 Group" letterhead that excitedly announced that 2021 was the year that "we
had hoped for" back in summer 2017 "when we launched the firm."  Helwani proudly described
a "new platform to help grow for years to come" and that i80 had closed a "transformational deal
with ICONIQ Capital."  The letter also stated that, in 2022, the firm hoped to raise even more
investor capital and cross $1 billion in AUM.  That would undoubtedly be good news for the
investors who stand to profit from this "transformational deal" and share in the millions of fees
generated by the platform built out by the operation and success of the i80 Limited Partnership.

76.     Almost offhandedly, the last bullet point in the November 2021 letter mentioned:

> In order to close the ICONIQ deal, **we had to restructure all of our legal entities**.  We will be sending out the updated docs shortly for your consent.  Once signed, we will be able to make your distributions from the new legal entities, within 5 business days. This structural change will also help us better manage our accounting of your interests going forward.

77.     Helwani surely figured that his matter-of-fact nature would allow his announcement to simply pass through without careful analysis or questioning by investors.  Of course, Helwani's statements reflected a critical truth that was his biggest concern.  If Helwani had the right to start a new fund with Iconiq dollars in which Plaintiffs were not entitled to participate, he would not have "had to" restructure any entities at all.  He simply could have started a new fund with different investors. But Helwani knew he had no right to do this, and that excluding Plaintiffs and other Class B Members from participating in the Iconiq Opportunity, or otherwise diluting their interests, required their consent.  Thus, Helwani urged Plaintiffs to exchange their Class B Member Interests for new, i80 AB Class B Interests, at substantially reduced participation levels.

78.     The proposed documents themselves reflect this reality, of which Helwani was wholly aware.  For example, a redlined proposed new LLC Agreement for Defendant i80 Investment Manager shows that Helwani tried to revise the "Allocations and Distributions" provisions to limit Plaintiffs' share to income from Management Fees from the "2019 Fund."  Of course, if the prior agreements already limited Plaintiffs to that single fund – contrary to everything Helwani said, did, wrote, and agreed to for years – there was no need to amend that provision at all.  But Helwani knew what the agreement was – and that it required modification to accomplish his ill motives.  He "had to restructure" the entities and agreements to accomplish his purposes, because his purposes were directly contrary to the parties' agreements.

79.     Helwani was able to pull the wool over many investors' eyes, but after Plaintiffs received the November 2021 letter, they immediately requested from Helwani a "summary of the changes and why."  Helwani promptly replied "Absolutely."  But he provided neither a summary nor an explanation of the changes.  Helwani continued to try to mask the breaches and violations he was hoping to accomplish, downplaying his scheme and telling Plaintiffs "the legal entities are changing and that the tag is no longer relevant.  Otherwise no other changes."  Helwani and his employees even went so far as to try to convince Class B Members that the new deal was "better."  Helwani knew full well that those statements were false and misleading.  His intent was to deceive Plaintiffs.

80.     There is no reason the Iconiq deal "required" any "restructuring" – all that was needed was the establishment of the new fund in which Plaintiffs already were entitled to participate.  But, in truth, the Class B Members were being asked to radically change their bargain.  Thus, contrary to Helwani's agreement and representations, his proposed changes were designed to cause a seismic result – formally and unequivocally divesting the Class B Members (including Plaintiffs) from any fee income, revenue, or profit distributions that might arise out of the i80 Iconiq Fund.  Helwani concealed the clear fact that he was asking the Class B Members to enter into a new agreement in which they would sign away the i80 Iconiq Fund fees and distributions to which they were entitled.

81.     Helwani sought to divert profits to himself in another way as well.  As part of the proposed changes, the new i80 AB Class B Interests into which he tried to trick Plaintiffs to swap in lieu of their former agreed-upon rights would no longer include Tag Along rights.  Thus, the Class A Members (such as Helwani) could transfer their Class A interests, and leave the Class B Members high and dry.

82.     On the other hand, just as in the Original Class B Interests, the new i80 AB Class

B Interests were subject to "Drag Along" rights, which also would benefit Helwani's Class A

interests.  In a Drag Along scenario, if the Class A Members transfer their interests, they can

force the i80 AB Class B members to transfer their shares on the same transfer terms.  The net

effect of these changes is to dramatically decrease Plaintiffs' bargaining power and leverage in

any transfer involving the Class A interests.

83.     The new LLC Agreements to which Helwani has tried to get Plaintiffs to agree

includes language that, in the event of a Drag Along or liquidation of the business, makes it

expressly clear that the new i80 AB Class B Interests "are not entitled to any portion of the

Purchase Price that relates to the business of the Company other than in respect of the [i80

Limited Partnership] as determined by the Managing Member [Helwani]."  This newly added

carveout was not included in Plaintiffs' existing Class B Interests.  Helwani "had" to try to get

the Class B Members like Plaintiffs to agree to these new terms, because he knew that none of

what he was trying to accomplish was permissible under the parties' agreements, and his plan

was contrary to all of his representations, promises, and assurances.  Helwani did not mention

any of this in his disclosures and statements to Plaintiffs; instead he assured them that the

changes were simply no big deal.  And again, if Helwani was entitled to create the new i80

Iconiq Fund without Plaintiffs already entitled to participate in it, he would not have had to

"restructure" anything to do so.

84.     In addition to the material misstatements and omissions, Defendants held hostage

distributions to Class B Members (such as Plaintiffs) who refused to exchange their securities for

new i80 AB Class B Interests upon realizing what Helwani was doing.  This refusal to distribute

income was inherently coercive, in bad faith, and indeed would have been an independent breach

of the parties' agreements (which provided for "mandatory" distributions).  Ultimately, in May

2022, after months of Helwani and the Management Entities withholding them, distributions

were made to Plaintiffs.

**Misuse of Confidential Information**

85.     In addition to constituting a clear breach of the parties' agreements, and reflecting

Defendants' material misrepresentations and omissions designed to induce Plaintiffs'

investments, Helwani's scheme also reflects a violation of the confidentiality terms governing

the business into which Plaintiffs invested.  As discussed above, the Management Entities

employ confidential and proprietary information and intellectual property in the course of the

performance of their business for the "firm."  That information and intellectual property includes

distribution platforms, software interfaces, customer lists, joint venture partners and resulting

work product, strategy, targeted markets and partners, investor lists, potential transactions,

analytics and financial models (the "Confidential Information").  Helwani marketed the Class B

Interests by claiming "Advantaged Originations that arose out of relationships with "exclusive"

and "proprietary" originators, who themselves had "signed NDAs."  That Confidential

Information was developed and refined over years of operations and hours of work and employee

time.  To protect this Confidential Information, the i80 Investment Manager LLC Agreement and

the i80 General Partner LLC Agreement restrict and prohibit Members from disclosing "any

information with respect to the Company, the [i80 Investment Fund], the Managers, or any of

their Affiliates" without prior written consent.

86.     On information and belief, Helwani and Class A Members have acquired,

disclosed, and/or used this Confidential Information in connection with the marketing,

negotiating and operation of the Iconiq Opportunity, and the i80 Iconiq Defendants are utilizing

this Confidential Information in connection with the operation and management of the Iconiq Fund.  No written consent was ever provided for this – Plaintiffs certainly did not provide any such consent – and, any such consent was not in the Company's best interest if Helwani intended the i80 Iconiq Opportunity to be separate from the business in which Plaintiffs invested. Moreover, on information and belief, the Management Entities have received no compensation for the use of this Confidential Information by Helwani and the i80 Iconiq Defendants.  This separate use and disclosure of Confidential Information is an independent breach of contract and fiduciary duty.

**Plaintiffs Attempt to Force Helwani to Do the Right Thing – And Get "Withdrawn"**

87.     Plaintiffs have attempted to resolve this dispute and have the Management Entities pursue these claims.  Plaintiffs' counsel had discussions with the Management Entities' counsel in December 2021.  The Management Entities refused to act or remedy these issues. Plaintiffs' counsel also discussed claims, including breach of duty claims, with the Management Entities' counsel in March 2021.  The Management Entities have refused to act or remedy these issues.

88.     The Management Entities are hopelessly conflicted and would never bring suit to enforce the claims.  Indeed, as described below, simply mentioning protecting investors' rights has resulted in an attempted termination and redemption.  That refusal to act or pursue any claims is premised on the fact that the person directly involved in the wrongdoing is Marc Helwani who is the Manager of the Management Entities and directly or indirectly controls them.  Any further demand to any i80 Defendant to pursue claims against Mr. Helwani is futile.

89.     If there were any doubt as to Helwani's improper motives or willingness to operate in good faith, such doubt was put to rest on May 24, 2022.  On that date, Helwani, acting as

Manager of each of the Management Entities, sent letters to each Plaintiff noticing their forced withdrawal from the business and their Class B Interests pursuant to Section 3.8 of the Amended and Restated Limited Liability Company Agreement of i80 Group LLC and the Amended and Restated Limited Liability Company Agreement of i80 Specialty Finance GP LLC, each dated June 30, 2019 (collectively, the "LLC Agreements").  Helwani did not even try to pretend that he was acting with anything other than pure retaliatory motive.  He stated plainly that the forced withdrawal was a result of Plaintiffs' "threats of litigation" and "efforts to disparage Manager and the Companies to other Class B Members."  In truth, Plaintiffs had simply communicated to Helwani their view that he was violating the parties' agreements and that if he insisted on depriving Plaintiffs the benefits of their bargain, Plaintiffs would have no choice but to seek relief from a court.  Helwani also did not specify any "disparage[ment]" because none exists.

90.     Plaintiffs rightfully have expressed concern that Helwani has violated, and is continuing to violate, their rights under the parties' agreements and applicable law.  Helwani's asserted right to terminate Plaintiffs' interests through a forced withdrawal is limited to where there is a basis to determine, in the Manager's "reasonable discretion," that "the continued undiminished membership of such Member in [each] Company would . . . be detrimental to the Company."  Helwani has not – and cannot – make that showing.  This is pure retaliation, plain and simple.  It shines further light on the true motives behind Helwani's and the Management Entities' unlawful scheme, and it constitutes a further independent breach of agreements and duties, entitling Plaintiffs to damages.

## CAUSES OF ACTION

### Count 1:  Securities Fraud
### (against Helwani, i80 Investment Manager, i80 General Partner)

91.     Plaintiffs repeat and incorporate the foregoing allegations as if fully set forth

herein.

92.     The Class B Member Interests were securities governed by the Securities

Exchange Act of 1934 ("the Act"), 15 U.S.C. §78j.(b), and SEC rule 10b-5, 17 C.F.R. §240.10b-

5.

93.     Helwani and the Management Entities offered to purchase or sell securities: (i) in

connection with the June 2017 Class B Interest purchases; (ii) the 2019 Class B Consent

Solicitation for existing Class B Members; (iii) the sale of securities for additional Class B

Interests in June 2019; (iv) the 2020 solicitation and sale of Class B Interests to Plaintiff

Sunscape in June 2020; and (v) the proposed purchase and sale or securities for the i80 AB Class

B Interests in 2021.

94.     Defendants made material misrepresentations and omissions of material fact to

cause Plaintiffs to enter into their investments.

95.     Defendants' misrepresentations and omissions included the representations set

forth herein, including that i80 General Partner was the general partner for all assets to be

managed as part of the business no matter the structure, name of each fund, or when each fund

was formed, and include, without limitation:

>    a.   Statements and omissions made in 2017 in connection with the original
>
>         solicitation including projections relating to the time period for returns and the
>
>         scope and extent of the revenue share, as reflected herein;

  b. Statements and omissions made in connection with the excel spreadsheet entitled "i80 Group Financial Model" as reflected herein;

  c. Statements and omissions made in June 2019 as reflected herein; and

  d. Statements and omissions made about the proposed changes to the Class B Interests in 2021 and 2022, as reflected herein, including that there were no material changes and that the changes were better for the Investors, despite the elimination of Tag Along Rights and an express disclaimer to any proceeds from the Iconiq Opportunity.

96. Defendants' misrepresentations and omissions of material fact constitute violations of Section 10(b) of the Securities Exchange Act of 1934 ("the Act"), 15 U.S.C. §78j.(b), and SEC rule 10b-5, 17 C.F.R. §240.10b-5. 46.

97. Defendants made each such misrepresentation or omission of material fact with knowledge or recklessness, in connection with the purchase of a security, upon which each Plaintiff reasonably relied and consequently suffered economic loss, which reliance was the proximate cause of its injury.

98. The statements were deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

99. Defendants were motivated, and intended, to deceive Plaintiffs in order to induce Plaintiffs to invest and purchase the Class B Interests.

100. Plaintiffs were damaged as a result, in an amount to be determined at trial.

**Count 2: Breach of Contract**
**(against Helwani)**

101.     Plaintiffs repeat and incorporate the foregoing allegations as if fully set forth

herein.

102.     Helwani, individually and on behalf of the Management Entities, and Plaintiff

AMF entered into an agreement in June 2017 that the Management Entities would manage all

assets under management raised by Helwani in connection with the business, and that Plaintiffs

would participate in a revenue share from all such assets under management.

103.     The parties' agreement is evidenced by the statements and writings of the parties,

and the parties' course of performance.

104.     In 2019, Helwani reconfirmed the parties' existing agreement and promised again

not to form any General Partner entity to manage funds outside the existing business in which

Plaintiffs had a participating interest.

105.     Plaintiff AMF performed its obligations by investing repeatedly in i80 Investment

Manager and i80 General Partner.

106.     Helwani breached the agreement by rejecting Plaintiff AMF's participation in the

Iconiq Opportunity and refusing to honor Plaintiff AMF's revenue share in the i80 Iconiq Fund

on the terms of the parties' agreements.

107.     As a result of Helwani's breach of the Agreement, Plaintiff AMF has been injured

thereby and will continue to suffer substantial monetary loss.

**Count 3: Breach of Contract**
**(against Helwani)**

108.     Plaintiffs repeat and incorporate the foregoing allegations as if fully set forth

herein.

109.    Helwani, individually and on behalf of the Management Entities, and Plaintiff Sunscape entered into an agreement in June 2020 that the Management Entities would manage all assets under management raised by Helwani in connection with the business, and that Sunscape would participate in a revenue share from all such assets under management.

110.    The parties' agreement is evidenced by the statements and writings of the parties, and the parties' course of performance.

111.    Plaintiff Sunscape performed its obligations by investing in i80 Investment Manager and i80 General Partner.

112.    Helwani breached the agreement by rejecting Plaintiff Sunscape's participation in the Iconiq Opportunity and refusing to honor Plaintiff Sunscape's revenue share in the i80 Iconiq Fund on the terms of the parties' agreements.

113.    As a result of Helwani's breach, Plaintiff Sunscape has been injured and will continue to suffer substantial monetary loss.

### Count 4: Breach of Contract
### (against Helwani, i80 Investment Manager, i80 General Partner)

114.    Plaintiffs repeat and incorporate the foregoing allegations as if fully set forth herein.

115.    In June 2017 and June 2019, Plaintiff AMF purchased Class B Interests in the Management Entities that were the subject of an Amended and Restated Limited Liability Company Agreement of i80 Group, LLC, and an Amended and Restated Limited Liability Company Agreement of i80 Group Specialty Finance GP LLC (the "i80 Group LLC Agreements").

116.    The i80 Group LLC Agreements set forth the limited circumstances under which the Manager may require the complete or partial withdrawal of a Member.

117.    On May 24, 2022, Helwani and the Management Entities provided notice to AMF that they were forcing the complete withdrawal of AMF from the Management Entities, on the alleged grounds that AMF's "threats of litigation against [the Management Entities] and [AMF's] efforts to disparage the Manager and the [Management Entities] to other Class Members are detrimental to the [Management Entities]" (the "<u>AMF Forced Withdrawal Notice</u>").

118.    Helwani and the Management Entities sent the AMF Forced Withdrawal Notice in retaliation for AMF's assertion of its rights under the parties' agreements described herein.

119.    AMF did not "disparage" either the Manager or the Management Entities, nor did AMF's assertion of its rights or expression of concern that Helwani and the Management Entities are acting unlawfully and in violation of the parties' agreements, or any other action,  constitute "disparage[ment]" or any valid basis to force AMF's withdrawal from the Management Entities or its Class B Interests.

120.    AMF has performed all obligations under the i80 Group LLC Agreements.

121.    Helwani and the Management Entities breached the i80 Group LLC Agreements by forcing AMF's withdrawal for a retaliatory purpose and with no basis under the i80 Group LLC Agreements.

122.    As a result of such breach, Plaintiff AMF has been injured thereby and will continue to suffer substantial monetary loss.

123.    As a result of such breach, Plaintiff AMF is entitled to monetary damages, and to have all of its interests restored in the Management Entities.

## Count 5: Breach of Contract
## (against Helwani, i80 Investment Manager, i80 General Partner)

124.     Plaintiffs repeat and incorporate the foregoing allegations as if fully set forth herein.

125.     In June 2020, Plaintiff Sunscape purchased Class B Interests in the Management Entities that were the subject of an Amended and Restated Limited Liability Company Agreement of i80 Group, LLC, and an Amended and Restated Limited Liability Company Agreement of i80 Group Specialty Finance GP LLC (the "i80 Group LLC Agreements").

126.     The i80 Group LLC Agreements set forth the limited circumstances under which the Manager may require the complete or partial withdrawal of a Member.

127.     On May 24, 2022, Helwani and the Management Entities provided notice to Sunscape that they were forcing the complete withdrawal of Sunscape from the Management Entities, on the alleged grounds that Sunscape's "threats of litigation against [the Management Entities] and [Sunscape's] efforts to disparage the Manager and the [Management Entities] to other Class Members are detrimental to the [Management Entities]" (the "Sunscape Forced Withdrawal Notice").

128.     Helwani and the Management Entities sent the Sunscape Forced Withdrawal Notice in retaliation for Sunscape's assertion of its rights under the parties' agreements described herein.

129.     Sunscape did not "disparage" either the Manager or the Management Entities, nor did Sunscape's assertion of its rights or expression of concern that Helwani and the Management Entities are acting unlawfully and in violation of the parties' agreements, or any other action, constitute "disparage[ment]" or any valid basis to force Sunscape's withdrawal from the Management Entities or its Class B Interests.

130.   Sunscape has performed all obligations under the i80 Group LLC Agreements.

131.   Helwani and the Management Entities breached the i80 Group LLC Agreements by forcing Sunscape's withdrawal for a retaliatory purpose and with no basis under the i80 Group LLC Agreements.

132.   As a result of such breach, Plaintiff Sunscape has been injured thereby and will continue to suffer substantial monetary loss.

133.   As a result of such breach, Plaintiff Sunscape is entitled to monetary damages, and to have all of its interests restored in the Management Entities.

### Count 6:  Fraudulent Inducement
### (against Helwani, i80 Investment Manager, i80 General Partner)

134.   Plaintiffs repeat and incorporate the foregoing allegations as if fully set forth herein.

135.   Helwani, i80 Investment Manager and i80 General Partner solicited Plaintiffs to purchase Class B Interests in i80 Investment Manager and i80 General Partner, based on false statements intended to induce their investment.

136.   Plaintiff AMF paid $500,000 in 2017 and $1,700,000 in 2019 for Class B Interests in i80 Investment Manager and i80 General Partner, in reliance on the false and materially misleading representations made by Helwani, i80 Investment Manager and i80 General Partner.

137.   Plaintiff Sunscape paid $900,000 for Class B Interests in i80 Investment Manager and i80 General Partner in 2020 in reliance on the false and materially misleading representations made by Helwani, i80 Investment Manager, and i80 General Partner.

138.     Defendants' representations of fact included the representations set forth herein, including that i80 General Partner was the general partner for all funds to be managed by the i80 Group no matter the name or when formed, and include, without limitation:

a.   Statements and omissions made in 2017 in connection with the original solicitation, including projections relating to the time period for returns and the scope and extent of the revenue share, as reflected herein;

b.   Statements and omissions made in connection with the excel spreadsheet entitled "i80 Group Financial Model" as reflected herein;

c.   Statements and omissions made in June 2019 as reflected herein; and

d.   Statements and omissions made about the proposed changes to the Class B Interests in 2021 and 2022, as reflected herein, including that there were no material changes and that the changes were better for the Investors, despite the elimination of Tag Along Rights and an express disclaimer to any proceeds from the Iconiq Opportunity.

139.     Those representations were false and materially misleading when made.

140.     The representations were made with the purpose and intent of inducing Plaintiffs to rely thereon.  Helwani, i80 Investment Manager and i80 General Partner knew or reasonably should have known that such representations were false and materially misleading when made.

141.     Plaintiffs relied on the misrepresentations, and did not know of the falsity of the representation when made.

142.     Plaintiffs were injured as a result of the misrepresentations and reliance thereon, in an amount to be proven at trial.

## Count 7:  Breach of Fiduciary Duty
## (against Helwani)

143.    Plaintiffs repeat and incorporate the foregoing allegations as if fully set forth herein.

144.    Plaintiffs are holders of Class B Member interests in the Management Entities.

145.    Helwani is a holder of Class A Member interests in the Management Entities.

146.    Helwani is a Manager of each of the Management Entities.  Under Delaware law including Section 18-1104 of the Delaware Limited Liability Company Act, as a Manager of the Management Entities, Helwani owed fiduciary duties to Plaintiffs.  Those duties include duties of loyalty and care.

147.    Helwani breached those fiduciary duties by among other actions:

   a.    Soliciting, marketing, and developing a business that competed with the Management Entities;

   b.    Diverting the Iconiq Opportunity to a different entity or entities, and away from Plaintiffs, when:

      i.    Helwani has a personal financial stake in i80 Iconiq Fund Group;

      ii.   The diversion of the Iconiq Opportunity was not in the interests of the Management Entities; and

      iii.  The diversion of the Iconiq Opportunity was not a valid exercise of business judgment.

   c.    Attempting to induce Class B Members, including Plaintiffs, to exchange their interests in the Management Entities for interests in the i80 AB Entities without full disclosure of his interests therein, or the facts regarding the Class B Members' rights under the existing and proposed agreements;

d.  Using the confidential information derived and created by the Management Entities to compete with the Management Entities;

e.  Failing to secure and improperly disclosing the confidential information derived and created by the Management Entities for personal financial gain; and

f.  Making false and materially misleading statements to induce investment and other action by Plaintiffs to their detriment.

g.  Unlawfully, and without basis, forcing Plaintiffs' withdrawal from the Management Entities.

148.   Helwani's breaches of duty have been the proximate cause of injury suffered by i80 Investment Manager.

149.   The amount of damages will be proved at trial, but the damages from the improperly diverted value of the Iconiq Opportunity to the i80 Iconiq Fund Group is expected to exceed $50 million.

## Count 8:  Breach of Fiduciary Duty Owed to i80 Investment Manager<br>(against Helwani)

150.   Plaintiffs repeat and incorporate the foregoing allegations as if fully set forth herein.

151.   Plaintiffs are holders of Class B Member interests in i80 Investment Manager.

152.   Helwani is a holder of Class A Member interests in i80 Investment Manager.

153.   Helwani is a Manager of i80 Investment Manager.  Under Delaware law including Section 18-1104 of the Delaware Limited Liability Company Act, as a Manager of i80 Investment Manager, Helwani owed fiduciary duties to i80 Investment Manager.  Those duties include duties of loyalty and care.

154.   Helwani breached those fiduciary duties by among other actions:

a.  Soliciting, marketing and developing a business that competed with i80 Investment Manager;

b.  Diverting the Iconiq Opportunity to a different entity or entities, and away from Plaintiffs, when:

    i.  Helwani has a personal financial stake in i80 Iconiq Fund Group;

    ii.  The diversion of the Iconiq Opportunity was not in the interests of i80 Investment Manager; and

    iii.  The diversion of the Iconiq Opportunity was not a valid exercise of business judgment.

c.  Inducing Class B Members, including Plaintiffs, to exchange their interests in i80 Investment Manager for interests in the i80 AB Entities without full disclosure of his interests therein, or the facts regarding the Class B Members' rights under the existing and proposed agreements;

d.  Using the confidential information derived and created by i80 Investment Manager to compete with i80 Investment Manager;

e.  Failing to secure and improperly disclosing the confidential information derived and created by i80 Investment Manager for personal financial gain; and

f.  Making false and materially misleading statements to induce investment and other action by Plaintiffs to their detriment.

155.  i80 Investment Manager is controlled by Helwani and any further demand would be futile in any event.

156.  Helwani's breaches of duty have been the proximate cause of injury suffered by i80 Investment Manager.

157.    The amount of damages will be proved at trial, but the damages from the improperly diverted value of the Iconiq Opportunity to the i80 Iconiq Fund Group is expected to exceed $50 million.

**Count 9:  Breach of Fiduciary Duty owed to i80 General Partner
(against Helwani)**

158.    Plaintiffs repeat and incorporate the foregoing allegations as if fully set forth herein.

159.    Plaintiffs are holders of Class B Member interests in i80 General Partner.

160.    Helwani is a holder of Class A Member interests in i80 General Partner.

161.    Helwani is a Manager of i80 General Partner.  Under Delaware law, including Section 18-1104 of the Delaware Limited Liability Company Act, as a Manager of i80 General Partner, Helwani owed fiduciary duties to i80 General Partner.  Those duties include duties of loyalty and care.

162.    Helwani breached those fiduciary duties by among other actions:

   a.   Soliciting, marketing and developing a business that competed with i80 General Partner;

   b.   Diverting the Iconiq Opportunity to a different entity or entities, and away from Plaintiffs, when:

      i.   Helwani has a personal financial stake in i80 Iconiq Fund Group.

      ii.   The diversion of the Iconiq Opportunity was not in the interests of i80 General Partner or entirely fair to i80 General Partner.

      iii.   The diversion of the Iconiq Opportunity was not a valid exercise of business judgment.

    c.   Inducing Class B Members, including Plaintiffs, to exchange their interests in i80 General Partner for interests in the i80 AB Entities without full disclosure of his interests therein, or the facts regarding the Class B Members' rights under the existing and proposed agreements;

    d.   Using the confidential information derived and created by i80 General Partner order to compete with i80 General Partner;

    e.   Failing to secure and improperly disclosing the confidential information derived and created by i80 General Partner for personal financial gain; and

    f.   Making false and materially misleading statements to induce investment and other action by Plaintiffs to their detriment.

163.    i80 General Partner is controlled by Helwani and any further demand would be futile in any event.

164.    Helwani's breaches of duty have been the proximate cause of injury suffered by i80 General Partner.

165.    The amount of damages will be proved at trial, but the damages from the improperly diverted value of the Iconiq Opportunity to the i80 Iconiq Fund Group is expected to exceed $50 million.

### Count 10:  Breach of Contract With i80 Investment Manager
### (against Helwani)

166.    Plaintiffs repeat and incorporate the foregoing allegations as if fully set forth herein.

167.    Plaintiffs are holders of Class B Member interests in i80 Investment Manager.

168.    Helwani is a holder of Class A Member interests in i80 Investment Manager.

169.    Helwani is a Class A Member of i80 Investment Manager.  As a Member, Helwani was obligated to keep confidential and not disclose any information with respect to i80 Investment Manager and the i80 Limited Partnership.

170.    Helwani breached that contractual obligation by among other actions:

    a.   Disclosing to third parties confidential information and intellectual property belonging to i80 Investment Manager, and soliciting, marketing and developing a business to compete with i80 Investment Manager; and

    b.   Using i80 Investment Manager's confidential information to form and operate the i80 Iconiq Fund and the i80 Iconiq Fund Group.

171.    Plaintiffs have requested i80 Investment Manager to pursue claims for Helwani's conduct.

172.    i80 Investment Manager is controlled by Helwani and any further demand would be futile in any event.

173.    Helwani's breaches have been the proximate cause of injury suffered by i80 Investment Manager.

174.    The amount of damages will be proved at trial, but the damages from the improperly diverted value of the Iconiq Opportunity to the i80 Iconiq Fund Group is expected to exceed $50 million.

### Count 11:  Breach of Contract With i80 General Partner
### (against Helwani)

175.    Plaintiffs repeat and incorporate the foregoing allegations as if fully set forth herein.

176.    Plaintiffs are holders of Class B Member interests in i80 General Partner.

177.    Helwani is a holder of Class A Member interests in i80 General Partner.

178.    Helwani is a Class A Member of i80 General Partner.  As a Member, Helwani was obligated to keep confidential and not disclose any information with respect to i80 General Partner and the i80 Limited Partnership.

179.    Helwani breached that contractual obligation by among other actions:

    a.    Disclosing to third parties confidential information and intellectual property belonging to i80 General Partner, and soliciting, marketing and developing a business to compete with i80 General Partner; and

    b.    Using i80 General Partner's confidential information to form and operate the i80 Iconiq Fund and the i80 Iconiq Fund Group.

180.    Plaintiffs have requested i80 General Partner to pursue claims for Helwani's conduct.

181.    i80 General Partner is controlled by Helwani and any further demand would be futile in any event.

182.    Helwani's breaches have been the proximate cause of injury suffered by i80 General Partner.

183.    The amount of damages will be proved at trial, but the damages from the improperly diverted value of the Iconiq Opportunity to the i80 Iconiq Fund Group is expected to exceed $50 million.

## Count 12: Breach of the Implied Covenant of Good Faith and Fair Dealing (against Helwani)

184.    Plaintiffs repeat and incorporate the foregoing allegations as if fully set forth herein.

185.    Helwani, individually and on behalf of the Management Entities, had a duty to Plaintiffs at all relevant times to act fairly and in good faith in carrying out his responsibilities

under the agreements between Helwani and Plaintiffs.  As implied in every contract, Helwani

had an obligation to act fairly and in good faith toward Plaintiffs, as well as an obligation to not

do anything to injure, frustrate, or interfere with the right of Plaintiffs to receive the benefits of

their agreements.

186.    Helwani breached the implied covenant of good faith and fair dealing by unfairly

dealing with Plaintiffs and by acting in bad faith toward Plaintiffs as alleged above.

187.    As a direct result of the breaches of the implied covenant of good faith and fair

dealing, as alleged herein, Plaintiffs have suffered damages in an amount to be proven at trial.

188.    Plaintiffs are entitled to recover from Helwani any and all damages suffered as a

result of said breaches, including without limitation attorneys' fees and the expenses of

litigations.

**Count 13:  Violation of the Defend Trade Secrets Act
(against Helwani and the i80 Iconiq Defendants)**

189.    Plaintiffs repeat and incorporate the foregoing allegations as if fully set forth

herein.

190.    The Management Entities own the Confidential Information described above,

which includes trade secrets relating to the operation and management of those entities.  These

trade secrets derive actual and potential independent economic value from not being generally

known to, and not being readily ascertainable through proper means by, other persons who can

obtain economic value from their disclosure or use.  Helwani has touted that the Confidential

Information remains confidential and that it helps the Management Entities distribute their

product and onboard investors.  In any business seeking to generate above market returns, the

technology, analysis, business methods, strategy, and risk hedging are fundamental to the

business and proprietary.

191.    The Confidential Information relates to a product or service used in or intended for use in interstate or foreign commerce.  Specifically, the Confidential Information is used to operate and manage the Management Entities, which operate in interstate commerce.

192.    The Management Entities have taken reasonable measures under the circumstances to keep the Confidential Information secret, including contractually restricting and prohibiting the Members from disclosing it without prior written consent.  Helwani has also touted that the Confidential Information has remained confidential.  On information and belief, other organizations working with the Management Entities have been required to sign non-disclosure agreements as a condition of receiving Confidential Information.

193.    Helwani has had access to the Confidential Information through his work on behalf of the Management Entities.  Helwani also had substantial motivation to use the Confidential Information in connection with the marketing, negotiating, and operation of the i80 Iconiq Defendants, who conduct the same business as the Management Entities.

194.    On information and belief, Helwani and Class A Members have improperly acquired, disclosed, and/or used the Confidential Information, and threaten to do the same, in connection with the marketing, negotiating, and operation of the Iconiq Opportunity.  On information and belief, the Iconiq Defendants are using the Confidential Information in connection with the operation and management of the i80 Iconiq Fund and threaten to do the same.

195.    Helwani knows or has reason to know that the Confidential Information was acquired by improper means and under circumstances giving rise to a duty to maintain its secrecy and limit its use, including common law and contractual duties owed by Helwani to the Management Entities.  Helwani also knows or has reason to know that the disclosure of the

52

Confidential Information to or by the i80 Iconiq Defendants was without the contractually required consent of the Management Entities.

196.    The i80 Iconiq Defendants know, at least through Helwani, that the Confidential Information was acquired by improper means and under circumstances giving rise to a duty to maintain its secrecy and limit its use, including common law and contractual duties owed by Helwani to the Management Entities.  The i80 Iconiq Defendants also know or have reason to know, at least through Helwani, that the disclosure of the Confidential Information to or by the i80 Iconiq Defendants was without the contractually required consent of the Management Entities.

197.    On information and belief, the Management Entities have received no compensation for the improper acquisition, disclosure, or use of the Confidential Information by Helwani and the Iconiq Fund Group.

198.    Helwani and the i80 Iconiq Defendants have caused and threaten to cause damages and irreparable harm to the Management Entities.

199.    The Management Entities are entitled to an award of damages.

200.    On information and belief, Helwani's and the i80 Iconiq Defendants' misappropriation has been and threatens to be reckless, willful, and malicious and thereby entitles the Management Entities to an award of exemplary damages and attorneys' fees.

201.    Helwani's and the i80 Iconiq Defendants' misappropriation and threatened misappropriation has caused or will cause the Management Entities irreparable and substantial injury and therefore cannot be fully redressed through damages alone.  An injunction prohibiting Helwani and the i80 Iconiq Defendants from misappropriating, using, or disclosing the Confidential Information in any manner, and ordering the i80 Iconiq Defendants to permanently

destroy or return any of the Confidential Information in their possession, custody, or control, including any materials that in any way were created through use of the Confidential Information, is necessary to provide the Management Entities and Plaintiffs with complete relief, unless Plaintiffs' rightful revenue share in the i80 Iconiq Defendants is restored.

202.    The Management Entities are controlled by Helwani and any further demand would be futile.  Indeed, Helwani purported to terminate and redeem Plaintiffs Class B Interests at even the threat of litigation, and there is no possibility this litigation would be pursued by the Management Entities.

<u>**Count 14:  Violation of the Delaware Uniform Trade Secret Act**</u>
<u>**(against Helwani and the i80 Iconiq Defendants)**</u>

203.    Plaintiffs repeat and incorporate the foregoing allegations as if fully set forth herein.

204.    The Management Entities own the Confidential Information described above, which includes trade secrets relating to the operation and management of those entities.  These trade secrets derive actual and potential independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from their disclosure or use.  Helwani has touted that the Confidential Information remains confidential and that it helps the Management Entities distribute their product and onboard investors.  In any business seeking to generate above market returns, the technology, analysis, business methods, strategy, and risk hedging are fundamental to the business and proprietary to the business.

205.    The Management Entities have taken reasonable measures under the circumstances to keep the Confidential Information secret, including contractually restricting and prohibiting the Members from disclosing it without prior written consent.  Helwani has also

touted that the Confidential Information has remained confidential.  On information and belief, other organizations working with the Management Entities have been required to sign non-disclosure agreements as a condition of receiving Confidential Information.

206.    Helwani has had access to the Confidential Information through his work on behalf of the Management Entities.  Helwani also had substantial motivation to use the Confidential Information in connection with the marketing, negotiating, and operation of the i80 Iconiq Defendants, who conduct the same business as the Management Entities.

207.    On information and belief, Helwani and Class A Members have improperly acquired, disclosed, and/or used the Confidential Information, and threaten to do the same, in connection with the marketing, negotiating, and operation of the Iconiq Opportunity.  On information and belief, the Iconiq Defendants are using the Confidential Information in connection with the operation and management of the i80 Iconiq Fund and threaten to do the same.

208.    Helwani knows or has reason to know that the Confidential Information was acquired by improper means and under circumstances giving rise to a duty to maintain its secrecy and limit its use, including common law and contractual duties owed by Helwani to the Management Entities.  Helwani also knows or has reason to know that the disclosure of the Confidential Information to or by the i80 Iconiq Defendants was without the contractually required consent of the Management Entities.

209.    The i80 Iconiq Defendants know or have reason to know, at least through Helwani, that the Confidential Information was acquired by improper means and under circumstances giving rise to a duty to maintain its secrecy and limit its use, including common law and contractual duties owed by Helwani to the Management Entities.  The i80 Iconiq

Defendants also know or have reason to know, at least through Helwani, that the disclosure of the Confidential Information to or by the i80 Iconiq Defendants was without the contractually required consent of the Management Entities.

210.   On information and belief, the Management Entities have received no compensation for the improper acquisition, disclosure, or use of the Confidential Information by Helwani and the Iconiq Fund Group.

211.   Helwani and the i80 Iconiq Defendants have caused and threaten to cause damages and irreparable harm to the Management Entities and Plaintiffs.

212.   The Management Entities and Plaintiffs are entitled to an award of damages.

213.   On information and belief, Helwani's and the i80 Iconiq Defendants' misappropriation has been and threatens to be reckless, willful, and malicious and thereby entitles the Management Entities and thus Plaintiffs to an award of exemplary damages and attorneys' fees.

214.   Helwani's and the i80 Iconiq Defendants' misappropriation and threatened misappropriation has caused or will cause the Management Entities and thus Plaintiffs irreparable and substantial injury and therefore cannot be fully redressed through damages alone. An injunction prohibiting Helwani and the i80 Iconiq Defendants from misappropriating, using, or disclosing the Confidential Information in any manner, and ordering the i80 Iconiq Defendants to permanently destroy or return any of the Confidential Information in their possession, custody, or control, including any materials that in any way were created through use of the Confidential Information, is necessary to provide the Management Entities and Plaintiffs with complete relief, unless Plaintiffs' rightful revenue share in the i80 Iconiq Defendants is restored.

215.     The Management Entities are controlled by Helwani and any further demand would be futile.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury regarding any and all issues so triable.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that the Court upon due consideration and resolution of Plaintiffs' claims:

A.     Enter judgment in favor of Plaintiffs and against Defendants on all Counts above;

B.     Order the disgorgement of all ill-gotten gains retained by Defendants;

C.     Enter an Order declaring that the forced withdrawal of Plaintiffs from the Management Entities is unlawful, and restoring Plaintiffs' Interests in the Management Entities;

D.     Enter an Order declaring that Plaintiffs own a revenue share in the i80 Iconiq Defendants on the same terms as existed with respect to the Management Entities;

E.     Order injunctive relief prohibiting the i80 Iconiq Defendants from improperly acquiring, using, or disclosing the Confidential Information in any manner, and ordering the i80 Iconiq Defendants to permanently destroy or return any of the Confidential Information in their possession, custody, or control, including any materials that in any way were created through use of the Confidential Information, unless Plaintiffs' rightful revenue share in the i80 Iconiq Defendants is restored;

F.     Enter judgement for all damages, exemplary damages, costs, expenses, and attorneys' fees, with interest, caused by Defendants' wrongful conduct as may be allowed by law and proved at trial; and

G.     Grant such other and further relief as may be just and proper.

**MORRIS JAMES LLP**

OF COUNSEL:

Brian D. Hail
Robert B. Kornweiss
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY 10022-2524

Aryeh S. Portnoy
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595

Dated:  May 30, 2022

/s/ K. Tyler O'Connell
Lewis H. Lazarus (#2374)
K. Tyler O'Connell (#4514)
Kirsten A. Zeberkiewicz (#4573)
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801
(302) 888-6800
*llazarus@morrisjames.com*
*toconnell@morrisjames.com*
*kzeberkiewicz@morrisjames.com*

*Attorneys for Plaintiffs AMF Trust Ventures LLC
and Sunscape Family Limited Partnership*